**In the Matter of FITTERER ENGI-
NEERING ASSOCIATES,
INC., Debtor.**

**Bankruptcy No. 81–00236.**

United States Bankruptcy Court,
E.D. Michigan, N.D.

March 2, 1983.

Morton E. Weldy, Saginaw, Mich., Andrew N. Farley, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Paul C. Cullom, Jr., Lane, Aitken, Ziems, Kice & Kananen, Washington, D.C., for respondent; Arnold Schafer, Birmingham, Mich., of counsel.

MEMORANDUM OPINION AND ORDER

HARVEY D. WALKER, Bankruptcy Judge.

Fitterer Engineering Associates, Inc., the Debtor in Possession, (hereinafter "FEA"), filed a Petition for Relief under Chapter 11 of the Bankruptcy Code on March 30, 1981. FEA filed an Application for Authority to Reject an Executory Contract between FEA and the law firm of Lane, Aitken, Kice & Kanen, (hereinafter "the Law Firm"). The Law Firm responded by filing an Objection to the Application for Authority to Reject an Executory Contract and Motion for Order Directing the Debtor to Make Accountings and to Make Payments to the Law Firm. A hearing was held before the Court on April 13, 1982. Represented at the hearing were FEA, the Law Firm and Forward Bay County, Inc., a secured creditor of FEA.

The parties agreed that the contract was not executory. The Court, therefore, denies the Application for Authority to Reject an Executory Contract. However there are still issues for the Court to decide as a dispute remained between the parties as to whether or not the Law Firm's claim was secured or entitled to any type of priority recognized under the Bankruptcy Code. The parties submitted briefs. At the Court's request, the parties submitted supplemental briefs as to the issue of whether or not the Law Firm's attorney lien was valid and perfected.

The parties all concede that there is no dispute in this case as to the facts. FEA, Dr. Fitterer and the Law Firm entered into a contract in 1972 and again in 1974 whereby the Law Firm was to render legal services on behalf of FEA in connection with both the U.S. Steel Corporation—Leeds & Northrup Company litigation and the Electro-Nite Company litigation. As compensation for services performed, the Law firm was to receive a percentage of the total gross moneys paid to FEA and Dr. Fitterer, jointly or severally, as compensation for or as settlement of any infringement or alleged infringement of Dr. Fitterer's patents, including interest. FEA also agreed to pay quarterly to the Law Firm 2½ percent of the net sales of FEA from the date of the contract and 50% of all moneys received from licenses other than those that were part of the infringement action. The 2½ percent of net sales and 50% of all moneys received from other licenses were limited to five times and in some instances three times the Law Firm's normal billing for services in connection with such activities and the Law Firm was to maintain records of billing in accordance with its normal practice.

The 1974 contract differed little from the 1972 contract in relation to the fees to be paid.

In settlement of the patent litigation, Leeds & Northrup Company was eventually granted a license under Dr. Fitterer's patents in January of 1975 and to resolve the dispute the parties were to make specified initial payments and specified royalty payments in the future. The Law Firm was to receive ⅓ of the ongoing license royalties. The Electro-Nite case was settled on terms not involving any financial consideration.

The Law Firm puts forth four separate theories as to why its claim should not be in the class of general unsecured claims. First, that FEA is a constructive trustee for the benefit of the Law Firm with respect to the Law Firm's one-third share of the Leeds & Northrup license royalties. Second, that FEA is estopped from treating the Law Firm in a manner which is different from the way in which FEA treats Dr. Fitterer. Third, that one-third of the post-petition patent license royalty accrued amount is an administrative expense. And fourth, that the Law Firm has a first priority attorney's lien on the funds generated by U.S. Steel—Leeds & Northrup patent litigation settlement and that the Law Firm's contingent fee is directly payable from the settlement fund.

■ The Court will first discuss whether or not the Law Firm holds an attorney's charging lien on the royalties paid to FEA. The existence and effect of an attorney's lien is governed by the law of the state in

which the legal services are to be performed. 7 Am.Jur.2d § 351 at 354.

There are no statutory provisions relative to attorney's liens in Pennsylvania and therefore, attorney's liens are governed by the common law. In *Recht v. Urban Development Authority of Clairton,* 402 Pa. 599, 168 A.2d 134, 136 (1961), the Pennsylvania Supreme Court, after a thorough discussion of the Pennsylvania precedent, set forth the following five factors as to when a charging lien will be recognized and applied:

> ... it must appear (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

It appears unnecessary to file a notice of the lien anywhere in order to perfect the lien against a third party and the lien appears to be a first lien for all purposes. *Recht v. Clairton Urban Redevelopment Authority,* supra. This type of attorney's lien relates back to and takes effect from, the time of the commencement of the services. 7 Am.Jur. § 332 at 343.

█ In applying the above rule, it appears to the Court that the Law Firm has met each element of the rule. While FEA argues that there is no fund to which the lien could attach, the Court disagrees with this contention. As soon as the royalties are paid over to FEA, a fund arises to which the attorney's lien can attach. As to item (2), the services of the Law Firm operated substantially and primarily to secure the royalty payments from Leeds & Northrop. It is from this fund the Law Firm seeks to be paid. Item (3) is present as both parties have previously agreed that the Law Firm would look to the fund rather

than the client for compensation. Item (4) is present since the lien claimed is limited to the Law Firm's fees, as determined by the contingency fee agreement, for the litigation by which the fund was raised. As to Item (5), FEA states that it does not seriously challenge the same. To date, the Law Firm claims to have received only a small fraction of the value of work done on FEA's behalf. A Pennsylvania court in commenting on when an attorney's lien should arise based on equitable considerations stated, "Accordingly, the court will impose a lien where the fund from which the attorney's fee is to come would be depleted by creditors with prior claims, leaving the attorney unpaid and unable to recover against his client." *Stein v. Philip,* 254 Pa.Super. 41, 385 A.2d 514 (Pa.Super. 1978). In the present case, the fund from which the firm's fee is to be paid would otherwise be depleted by FEA's creditors, leaving the Law Firm unpaid its agreed share of the fund and unable to recover its share against its client.

Based on the foregoing analysis, the Court holds that the Law Firm does have a lien on the royalties paid to FEA under the contingency fee agreement. As the Court has found that the Law Firm has a valid attorney's lien, it finds it unnecessary to discuss the three other theories of recovery put forth by the Law Firm.

The Law Firm's attorney's lien takes its claim out of the class of general unsecured creditors. An authority directly on point is *Matter of Pacific Far East Line, Inc.,* 654 F.2d 664 (9th Cir.1981). The facts of the present case are similar to *Pacific Far East.* In that case, an attorney, Alioto, had represented a Debtor in Possession, PFEL, in a substantial and complex case based on a breach of warranty claim. Alioto was to receive a contingency fee of 15% of the value of anything recovered by settlement. One month before the case was settled, PFEL filed a Chapter XI petition in the Bankruptcy Court. Alioto was appointed special counsel by the Bankruptcy Court. The Bankruptcy Court awarded Alioto his contingency fee.

On appeal, the Official Creditors Committee contended that the amount awarded to Alioto for services performed before the arrangement should be treated as a general creditor's claim, thus subject to the pro rata reduction applicable to all other unsecured claims. Alioto, however, contended that he had a first priority attorney's lien on the funds generated by the litigation settlement and that his fee was payable directly from the settlement fund in discharge of this lien.

The Ninth Circuit Court of Appeals found that Alioto did have a first priority attorney's lien. The court stated: (654 F.2d at 668 n. 6)

At common law, an attorney retained on a contingent fee has a lien in the amount of his fees against any fund generated due to his efforts. *In re E.C. Ernst, Inc.,* 4 B.R. 317, 319–20 (Bkrtcy.S.D.N.Y.1980); Thompson, *Attorneys' Fees and Liens,* 85 Com.L.J. 136, 140–41 (1980).

The Court further ruled (654 F.2d at 670): With the existence and amount of a valid attorney's lien thus established, it was proper for the bankruptcy court to immediately award Alioto the portion of the fee which related to pre-petition services. *In re Land Investors, Inc.,* 544 F.2d 925, 928 (7th Cir.1976); *In re S.T. Foods, Inc.,* 202 F.Supp. 37 (S.D.N.Y.1962); 3A Collier's on Bankruptcy ¶ 64.02[2], at 2065–69 (14th ed. 1975). As found by the bankruptcy court, 95 percent of Alioto's services were rendered prior to the Chapter XI arrangement, and thus 95 percent of the $1.5 million award, or $1,425,000, should have been set aside in satisfaction of Alioto's lien against the settlement proceeds and immediately awarded to Alioto. *Id.*

In the present case, the Law Firm's attorney's lien is valid and perfected and arose from pre-petition services. The Law firm is therefore a secured creditor and is entitled to its one-third share of the royalties.

The Law Firm has a valid, perfected lien which survives bankruptcy. However, FEA would have the court declare that as to any royalties earned within 90 days prior to the date FEA filed its voluntary petition in bankruptcy, the attachment of the attorney's lien to these royalties would have been an attachment to after acquired collateral and therefore a preference avoidable under 11 U.S.C. § 547(c)(5). This section provides:

(c) The trustee may not avoid under this section a transfer—

\* \* \* \* \* \*

(5) of a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interest for

such debt on the later of—

(A)(1) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or

Section 547(c)(5) of the Bankruptcy Code relates only to a perfected security interest in inventory or a receivable or the proceeds of either. Therefore, it is necessary to examine the nature of the royalties, as collateral, to determine if the section applies. The parties contend that the collateral is either an account or a general intangible. The Bankruptcy Code defines a receivable in 11 U.S.C. § 547(a)(3) as follows:

... a right to payment, whether or not such right has been earned by performance...

This section conforms substantially, and was intended by Congress to conform, to Section 9–106 of the Uniform Commercial Code, which defines an "account" as any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. (See Colliers on Bankruptcy, 15th Edition, Volume 4, Page 547–18 and "Analysis of H R 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 179, 1977.)

A "general intangible" is defined "as any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." UCC § 9–106 (1977). The official comment to the above section attempts to further delineate the distinction between an account and a general intangible:

"Account" is defined as a right to payment for goods sold or leased or services rendered; the ordinary commercial account receivable. In some special cases a right to receive money not yet earned by performance crystalizes not into an account but into a general intangible, for it is a right to payment of money that is not "for goods sold or leased or for services rendered." Examples of such rights are the rights ... to receive payment under licenses of patents ... UCC 9–106, Official Comment (1977).

Dr. Fitterer and FEA hold the right to receive payments under the patent license agreement. Any amount received by Dr. Fitterer or FEA is subject to the right of the Law Firm to collect their fee under the contingency fee agreement. The right the Law Firm holds to collect its fee for services rendered is a contract right and, therefore, is classified as an account as opposed to a general intangible.

FEA argues that as the royalty payments are a receivable, the Law Firm's security interest in receivables would be subject to the improvement in position rule set forth in 11 U.S.C. § 547(c)(5). The improvement in position test "under the Code is the obtaining by a creditor, out of the Debtor's property of a greater percentage of his debt than some other creditor would have received under the distributive provisions of the Code had the transfer not been made. The burden of proof in this respect is on the trustee." 4 Colliers on Bankruptcy ¶ 547.35 at 547–108 (15th Ed.1979).

While the above quote refers to the trustee having the burden of proof, in the present case it is on FEA. Under 11 U.S.C. § 1107, a Debtor in Possession possesses the same powers as a trustee to avoid certain transfers.

FEA has failed to carry its burden of proof as to the Law Firm having improved its position by the attorney's lien having attached to royalties paid to FEA within 90 days of the filing of FEA's Petition in Bankruptcy. The only proof offered is a bald statement that the Law Firm is subject to the improvement in position test. While this is true, no proofs were offered to show that the position of the Law Firm was improved. Therefore, this Court must hold that the attachment of the attorney's lien to royalties paid to FEA within 90 days of filing, if there were any such royalties paid, cannot be avoided as a preference under Section 547(c)(5).

■   FEA also asserts that the attorney's lien as to royalties earned post petition is not valid. 11 U.S.C. § 552(a) states:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

FEA would have the Court determine that any royalties received post petition are after acquired property and therefore subject to the above section. However, a careful reading of the section shows that only a "lien resulting from any security agreement entered into by the Debtor" is invalid in bankruptcy as to after acquired property. As the legislative history to this section provides: "It (§ 552) applies to all security interests as defined in Section 101 of the Bankruptcy Code, not only to U.C.C. security interests." Collier Bankruptcy Code Pamphlet Edition § 552, Legislative History at 169. Colliers on Bankruptcy goes on to quote the legislative history of Section 552 at length:

Paragraphs [36 and 37 of section 101] define "security agreement" and "security interest." A security interest is one of the kinds of liens. It is a lien created by an agreement. Security agreement is defined as the agreement creating the security interest. Though these terms are similar to the same terms in the Uni-

form Commercial Code, article IX, they are broader. For example, the U.C.C. does not cover real property mortgages under this definition, such a mortgage is included, as are all other liens created by agreement, even though not covered by the U.C.C. All U.C.C. security interests and security agreements are, however, security interests and security agreements under this definition. S Rep No 989, 95th Cong, 2d Sess 91 (1978); H R Rep No 595, 95th Cong, 1st Sess 313–314 (1977); supra at ¶ 552.02 at 552–02.

The lien in the present case arose by operation of common law not by agreement of the parties. As the above quote illustrates, Section 552 applies only to consensual liens and not to the type of lien held by the Law Firm in this case, which lien arose by operation of common law. Therefore, Section 552 cannot be used to cut off the Law Firm's lien in royalties received after the filing of the Chapter 11 Petition.

As the law firm has a valid, perfected lien on the Leeds-Northrup royalty payments, which lien survives bankruptcy, the law firm is entitled to an accounting of all royalties received by FEA for which it has not received its share of the royalty.

IT IS SO ORDERED.