**In re Lillian E. ASHLEY, Debtor.**

**Bankruptcy No. 83–00624.**

United States Bankruptcy Court,
E.D. Michigan, N.D.

May 11, 1984.

Terrence H. Bloomquist, Grayling, Mich., for debtor and secured creditor.

Ralph I. Selby, Bay City, Mich., for Trustee.

William Klintworth, Traverse City, Mich., for debtor.

## OPINION

ARTHUR J. SPECTOR, Bankruptcy Judge.

This case comes before the Court as a motion by the trustee for turnover of funds held by a custodian under § 543(b)[1] and a cross-motion by an attorney who represented the debtor in litigation against an insurance company for an award of his attorney fees under a contingency-fee contract with the debtor, where the source of the custodian's funds is the settlement proceeds of the insurance litigation.

### FACTS

On November 22, 1983, the debtor filed her petition for relief under Chapter 7 of the Bankruptcy Code together with a statement of affairs for debtor not engaged in business and her schedules in bankruptcy. Question number 10 of the statement of affairs, which requires the debtor to detail any litigation pending at the time of the filing of the petition in which the debtor is a party, was answered with a response which omitted any reference to the pendency of a lawsuit filed by her and pending in the Roscommon County Circuit Court entitled *Ashley v. State Farm Mutual Automobile Insurance Company*, No. 82–3075–CK. Schedule B–2(q) also omitted any reference to the existence or value of the cause of action. The debtor's bankruptcy attorney, William F. Klintworth, later explained that he had no knowledge of that lawsuit when the pleadings were being prepared, that the debtor was becoming senile, and that her friends had to assist in the preparation of the schedules and statement of affairs. In short, he explained that the omissions were inadvertent.

Meanwhile, Terrence H. Bloomquist, the attorney who was retained on June 10, 1981 by the debtor to pursue the litigation under a written contingency-fee agreement, did not know that his client had filed bankruptcy. He proceeded to settle the lawsuit for $27,000 on December 19, 1983–27 days post-petition. At the time that case was settled, Mr. Bloomquist was advised that his client was in bankruptcy. The settlement order allocated the $27,000 proceeds as follows:

1. Unless otherwise noted, all reference to sections will be to 11 U.S.C.

"Economic loss including medical expenses and wage loss pursuant to MCLA 500.3107 and MCLA 500.3107[a] ... $1,000;

"All other claims including non-economic loss, pain and suffering, mental anguish and the like ... $26,000."

Mr. Bloomquist and the attorney for the insurance company, Douglas J. Read, agreed that Mr. Read would hold the settlement funds pending direction from this Court.

That is when the trustee first learned of the existence of the insurance lawsuit. The trustee filed her motion to compel Mr. Read, the alleged custodian as defined in § 101(10), to turn over the settlement proceeds to her. Mr. Read answered the motion, admitting the essential facts, and stating his willingness to abide by the Court's directions respecting the disposition of the funds. He also reported the interest the funds had earned while in his custody and requested a flat $500 "fee" for the performance of his "duties", presumably under § 543(c).

On February 14, 1984, the state court entered an order in the insurance litigation "perfecting" Mr. Bloomquist's common-law attorney's charging lien on the settlement proceeds. Thereafter, on March 30, 1984, Mr. Bloomquist filed a motion in this Court requesting an award to him of his fees and the costs he expended on the debtor's behalf—a total of $9,439.90—from the settlement proceeds. He argued that he had a common-law attorney's charging lien on the proceeds derived from his efforts and that the trial judge's order of February 9, 1984, perfected that lien. He argued that § 546(b) permitted the post-petition perfection of this lien. His second theory bootstrapped from the first. Assuming the validity of his lien, he argued that he was therefore a "joint owner" of the fund with the debtor, and would be entitled to his part of the whole, much like a non-debtor spouse receiving her share of joint property

sold by the trustee. In another pleading, Mr. Bloomquist alleged that the settlement funds were "not the property of the Estate ..." ostensibly because the insurance company's draft was made payable jointly to the debtor and himself, and put into a special account which required their joint signatures to withdraw the funds.

Finally, on February 14, 1984, the debtor amended her claim of exemptions to claim the proceeds exempt under § 522(d)(11)(D) & (E). The trustee resists those exemptions.

The Trustee demands turnover from the custodian, resists the allocation of damages in the settlement order, and the debtor's claims of exemption to them; Mr. Bloomquist claims a lien on the settlement proceeds and requests payment thereof; and the custodian requests compensation therefrom.

## ANALYSIS

In their rush to grab the brass ring, all of the parties ignored the issue of whether the settlement was validly entered into by Mr. Bloomquist. On November 22, 1983, when the bankruptcy petition was filed, the cause of action against State Farm became property of the estate. § 541; *Tonry v. Hebert,* 724 F.2d 467 (5th Cir.1984); *In re Ward,* 32 B.R. 318 (Bankr.E.D.Va.1983). Accordingly, the debtor ceased to be the real party in interest and was substituted in that role by the trustee. Notwithstanding his lack of knowledge, for all of this occurred by operation of law, Mr. Bloomquist's "client" was the trustee, and not the debtor. Mr. Bloomquist never asked the trustee whether the proposed settlement was acceptable to her, and to date, she has never indicated her approval or disapproval thereof.[2]

To complicate matters further, enter § 365. That section provides that a Chapter 7 trustee has 60 days to either assume or reject an executory contract, and that in

---

**2.** Rule 2002(a)(3) requires that the trustee provide 20 days notice of such settlements to creditors.

default of an express election within that period, the executory contract is deemed rejected. It is undisputed that the trustee did not expressly assume the contingency-fee contract with Mr. Bloomquist within 60 days of her appointment, nor even within 60 days of her receipt of notice of the litigation.

### WAS THIS ATTORNEY–CLIENT CONTINGENCY–FEE CONTRACT AN EXECUTORY CONTRACT?

An executory contract has been defined as: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973). *Tonry v. Hebert, supra,* dealt with the question of whether an attorney's contingency-fee contract was an executory contract assumable by the trustee where the debtor was the attorney himself. That case held that such contracts are executory contracts as defined by § 365, but held that since the attorney's responsibilities were for "personal services", the contract was not assumable by the estate. Judge Schwartzberg in *In re PDQ Copy Center, Inc.*, 27 B.R. 123 (Bankr.S.D.N.Y.1983) assumed without discussion that such a contract was executory and held that it was deemed rejected by the trustee's failure to timely assume it.

 In this case, when the petition for relief was filed, the litigation was still pending: trial had not been held and settlement had not been made. Clearly, under Professor Countryman's definition, at the time of the filing of the bankruptcy petition, Mr. Bloomquist had further responsibilities not yet performed, while the debtor had the unperformed duty to pay the bargained-for fee. Under either Professor Countryman's definition or under *Tonry v. Hebert, supra,* and *In re PDQ Copy Center, Inc., supra,* the Court finds that Mr.

Bloomquist's contingency-fee contract was an executory contract.

 The logical consequence of this finding when combined with the earlier finding that the trustee did not expressly assume that contract within the 60 days allowed her for that purpose is that that contract is deemed rejected. § 365(d)(1); *Alioto v. Official Creditor Committee*, 654 F.2d 664 (9th Cir.1981); *In re PDQ Copy Center, Inc., supra.* That rejection relates back to the moment immediately before the filing of the petition for relief. § 365(g)(1); *Alioto v. Official Creditor Committee, supra; In re PDQ Copy Center, Inc., supra; In re E.C. Ernst, Inc.,* 4 B.R. 317 (Bankr.S.D.N.Y.1980); *In re Fitterer Engineering Associates, Inc.,* 27 B.R. 878 (Bankr.E.D.Mich.1983); *In re TLC of Lake Wales, Inc.,* 13 B.R. 593 (Bankr.M.D.Fla.1981). On that date, November 22, 1983, no settlement had yet been reached. As a result of the trustee's rejection of it, Mr. Bloomquist's contract was no longer in existence at the time he "settled" the litigation. He, therefore, lacked any contractual authority from his client, the trustee, to enter into the settlement. Accordingly, unless the settlement agreement is ratified by the trustee, it is not binding upon her and she may proceed to litigate the case to its conclusion.

At the hearing upon these various motions held on April 19, 1984, it was apparent that the trustee had never considered the ramifications of her failure to act. Accordingly, the Court directed that the trustee had two weeks to either ratify the settlement or to rescind it. If the trustee rescinds the settlement, she may then seek the appointment of her own attorney—either Mr. Bloomquist or another—to represent her in the litigation.

If the trustee decides to change attorneys, and the litigation is unsuccessful, Mr. Bloomquist may indeed wind up with nothing for his better than two years of effort for the debtor. But that is the same fate he would suffer if his client, the debtor, had refused the offer of settlement and required him to try the case to failure. Those are the risks which come with contin-

gency-fee contracts and why the pay-off for the attorney is so lucrative upon success.

### DOES MR. BLOOMQUIST HAVE A CLAIM AGAINST THE PROCEEDS OF THE LITIGATION?

■ If the trustee ratifies this settlement obtained by Mr. Bloomquist, it would be tantamount to a retroactive assumption of his executory contingency-fee contract. The assumption of an executory contract requires the trustee to perform the debtor's obligation under that contract, as a contract is assumed *"cum onere"*. *In re Silver*, 26 B.R. 526, 7 C.B.C.2d 1107 (Bankr.E.D.Pa.1983); *cf., In re PDQ Copy Center, Inc., supra.* In this case, performance would be due immediately. Accordingly, if the trustee ratifies the settlement, Mr. Bloomquist will be entitled to his bargained-for percentage of the proceeds, plus his costs, all pursuant to the terms of the contingency-fee contract.[3]

On the other hand, if the trustee disavows the settlement, and hires a new attorney who successfully litigates the cause of action, is Mr. Bloomquist entitled to any part of the proceeds?

When an executory contract is rejected, the obligee is entitled to a claim against the estate for a breach of the contract. § 502(g). Thus, Mr. Bloomquist would receive a claim against the estate. Mr. Bloomquist argues that his claim is a secured one by virtue of his common-law attorney's charging lien against the proceeds. If it is a secured claim, it would be paid out of the insurance proceeds before they are reduced by the estate's administrative expenses. If it is deemed an unsecured claim, then its payment would be subsequent to allowed administrative and priority claims and would await distribution to, and be pro-rated with, the claims of all other general creditors. § 507. Clearly, an unsecured claim would likely result in a later and much smaller payment to Mr. Bloomquist.

**3.** As explained *infra,* Mr. Bloomquist has an attorney's common-law charging lien on the fund resulting from his efforts, and therefore he

### IS MR. BLOOMQUIST SECURED BY AN ATTORNEY'S CHARGING LIEN ON THE PROCEEDS OF THE SETTLEMENT?

■ Michigan has no statutory basis for the imposition of an attorney's charging lien. Such a lien, if it exists at all, is therefore of common-law origin. *Bruce v. United States*, 127 F.Supp. 858 (E.D.Mich. 1955); *Fraam v. Kelley*, 268 Mich. 573, 256 N.W. 552 (1934); *Shank v. Lippman*, 249 Mich. 22, 227 N.W. 710 (1929); *Wipfler v. Warren*, 163 Mich. 189, 128 N.W. 178 (1910). An attorney's charging lien is "an equitable right to have the fees and costs due to him for services in a suit secured to him out of the judgment or recovery in that particular suit." 3 Michigan Law and Practice, Attorneys and Counsellors, § 161; *Jones v. O'Donnell*, 292 Mich. 189, 290 N.W. 375 (1940), *Fraam v. Kelley, supra; Bruce v. United States, supra.* Mr. Bloomquist's claim fits within this definition. Under Michigan law, no specific procedure is devised for the "perfection" of the lien. Since there was no further act necessary to perfect this lien, it is invulnerable to attack by the trustee under § 544 or under § 547. *In re Fitterer Engineering Associates, Inc., supra; In re Boots Builders, Inc.,* 11 B.R. 635 (Bankr.N.D.Tex.1981); *In re Durkay,* 9 B.R. 58, 3 C.B.C.2d 941 (N.D.Ohio 1981).

■ If the trustee elects to disavow the settlement and to thereby reject Mr. Bloomquist's contingency-fee executory contract with the debtor, this case would then fall squarely within the facts of *In re PDQ Copy Center, Inc., supra.* There, the court determined that the attorney's claim which resulted from the trustee's rejection of his contingency-fee contract with the debtor was a secured claim arising from New York State's statutory attorney charging lien law, which appears to be substantially similar to Michigan's common law provision. Also see *In re Durkay,*

would be entitled to receive the compensation per his contract under that theory as well.

*supra.* Although Act [4] cases, three recently decided cases are consistent with this view of the law. *Alioto v. Official Creditor Committee, supra; In re E.C. Ernst, Inc., supra; In re TLC of Lake Wales, Inc., supra.* There appears to be no material change effected by the adoption of the Bankruptcy Code [5] in this area of the law.

Although the holding in *In re Yermakov,* 718 F.2d 1465 (9th Cir.1983) appears to be contradictory to the cases cited above, they can be harmonized. The bankruptcy judge in *Yermakov* "found as a fact that the successful settlement primarily resulted from the efforts of the trustee ... and not from those of [the debtor's attorney]." *Id.* at 1468. It is the essence of an attorney's charging lien, that "the fund out of which the attorney seeks to be paid must have been secured substantially by the attorney's services rendered in creating such fund." *In re E.C. Ernst, Inc., supra* at 319; *Fraam v. Kelley, supra,* 268 Mich. at 576, 256 N.W. 552; see 4B Collier on Bankruptcy § 70.87[2] (14th ed. 1898); *Fannon v. LeBeau,* 245 Mich. 162, 222 N.W. 115 (1928). Since the fund obtained in *Yermakov* was not created substantially by the services of the attorney, a charging lien never arose. Therefore, the court utilized the traditional § 330(a) standard in deciding the attorney's compensation. In the case at bar, it is undisputed that Mr. Bloomquist's efforts were solely responsible for the creation of the fund. As a result, the charging lien was established and its efficacy is hereby recognized. Therefore, the Court finds that if the trustee disavows the settlement, Mr. Bloomquist's resulting claim in this case shall be deemed to be secured by whatever fund develops from the continuation of the insurance litigation.

After disavowal and rejection of the contract, the trustee may re-hire Mr. Bloomquist or hire another attorney for the special purpose of the insurance litigation by applying under § 327(e). *See* 2 Collier on Bankruptcy, ¶ 327.03[6] (15th ed. 1979). The basis of the attorney's compensation can be set at that time. If the trustee selects someone other than Mr. Bloomquist, Mr. Bloomquist will still have a claim to some of the fund, as the Court has already held that his claim which results from the breach of his executory contract is secured by the fund resulting from the litigation. However, the valuing of that claim upon a recovery by his successor would be this Court's responsibility. *Alioto v. Official Creditor Committee, supra; In re Ward, supra; In re PDQ Copy Center, Inc., supra.* This court would adopt the fee review methods outlined in those cases; moreover, the technique utilized by the bankruptcy courts in cases where a discarded attorney seeks to recover from a fund obtained at least partially by his successor, (i.e., quantum meruit), appears to be consistent with state practice. *Ambrose v. Detroit Edison Co.,* 65 Mich.App. 484, 237 N.W.2d 520 (1975), *lv. den.,* 397 Mich. 888 (1976).

## DEBTOR'S CLAIM OF EXEMPTIONS

When she amended Schedule B–4, the debtor claimed her exemption of $7,500 for bodily injury pursuant to 522(d)(11)(D) and an exemption of $20,000 for lost future earnings, pursuant to § 522(d)(11)(E). The trustee objects to these exemptions.

Although the debtor, in an obviously self-serving attempt to maximize her net recovery, stipulated with the insurance company in the circuit court action as to an allocation of the settlement proceeds, that allocation may not be binding upon the trustee. Of course, if the trustee disavows the settlement, the allocation which was merely a part thereof, becomes irrelevant.

However, if the trustee ratifies the settlement, must she accept the allocation? In essence, the question is whether the allocation term of the settlement is severable from the balance of the agreement. That question awaits further proofs, for if the allocation is found to have been an essential part of the agreement, it may not be jettisoned by the trustee. If it is not an

---

4. Bankruptcy Act of 1898, as amended.

5. Bankruptcy Reform Act of 1978.

essential element of the agreement, then the Court will make its own apportionment of the settlement proceeds. Relevant to the decision on severability will be the issues in the state court litigation, the nature and amounts of the damages sought, the mediation positions of the parties and the negotiations which led to the settlement. Once the question of the allocation of damages is determined, the focus will shift to the application of the exemption statute to the damages awarded.

## CUSTODIAN'S CLAIM FOR "FEES"

 Section 543(c)(2) provides:

"The court, after notice and a hearing shall—provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian."

A request for a custodian's fee must contain a sufficient itemization of effort expended and results accomplished to enable the Court to make a reasoned determination that the amount requested is "reasonable compensation for services rendered." *In re Gomes*, 19 B.R. 9; 8 B.C.D. 1401 (Bankr.D.R.I.1982); *In re Left Guard of Madison, Inc.*, 11 B.R. 238; 7 B.C.D. 974 (Bankr.W.D.Wis.1981). In this case the custodian has requested $500 without the slightest justification for it. Indeed, the request seems more like an afterthought than a proper application. Based upon the total lack of documentation to support the allowance of any compensation whatsoever, the request for such compensation is hereby denied *in toto*.

Therefore, if the trustee ratifies the settlement, the custodian shall forthwith pay over the entire settlement fund, together with any interest earned, and without deduction for any "expenses", to the trustee, without further order of the Court. Of course, if the trustee disavows the settlement, the custodian is free to return the funds to his client, State Farm, if he wishes, or take whatever actions with respect to it as he deems appropriate, as the fund will not be *in custodia legis*.

## RECAPITULATION

The Debtor's cause of action became property of the estate at the instant she filed her petition for relief on November 22, 1983. Thus, Mr. Bloomquist lacked authority to settle the case in December, 1983. The debtor's contingency-fee agreement with her attorney, Mr. Bloomquist, was an executory contract which was deemed rejected when the trustee failed to timely assume it. Merely as a matter of expediency, (for nobody—not the debtor, Mr. Bloomquist, nor the trustee—wished to abrogate the settlement without further thought), the trustee is allowed 14 days from the date of this opinion, to decide whether she wishes to ratify the settlement or disavow it. If the trustee ratifies it, then Mr. Bloomquist will be entitled to his contractual fees and expenses. Furthermore, the Court will then take proofs on the question of the severability of the allocation of damages term of the agreement.

If the trustee disavows the settlement, then she shall appoint an attorney (Mr. Bloomquist or another) to continue the litigation. If she chooses someone other than Mr. Bloomquist, his claim for the rejection of his executory contract shall be deemed secured by a common-law attorney's charging lien on the proceeds of the litigation (if any), the valuation of which will follow the practice outlined in *Alioto v. Official Creditor Committee, supra; In re Ward, supra* and *In re PDQ Copy Center, Inc., supra*.

After all of the foregoing has been accomplished, the Court will decide, if necessary, whether the apportionment of damages contained in the state court order of dismissal is binding, and, if not, it will perform its own apportionment. Thereafter, the debtor's exemptions will be applied to the net recovery.

The custodian shall await the trustee's decision with regard to the state court settlement. If, but only if, she ratifies that settlement, he shall forthwith pay $9,439.90 of the funds he holds to Mr. Bloomquist and the balance thereof to the trustee. Finally, the custodian's "application" for

compensation is denied for lack of support or justification.

IT IS SO ORDERED.